

**FILED**

May 18 2016, 8:12 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Patti J. Taylor
Taylor Law Office, P.C.
Warsaw, Indiana

Karl L. Mulvaney
Margaret M. Christensen
Jessica Whelan
Bingham Greenebaum Doll LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Stephen R. Snyder
Randall L. Morgan
Snyder Morgan LLP
Syracuse, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Craig Neibert,

*Appellant-Petitioner,*

v.

Jody A. Perdomo,

*Appellee-Respondent*

May 18, 2016

Court of Appeals Case No.
43A03-1503-CC-99

Interlocutory Appeal from the
Kosciusko Superior Court

The Honorable Joe V. Sutton,
Judge

Trial Court Cause No.
43D03-1202-CC-100

**Crone, Judge.**

# Case Summary

[1] In this interlocutory appeal, Craig Neibert challenges the trial court's grant of involuntary dismissal of his implied contract and unjust enrichment claims against his ex-girlfriend Jody A. Perdomo, arising out of the renovation of one house and the construction of another. He submits that the trial court erred in (1) granting Perdomo's motion for involuntary dismissal before he had rested his case; (2) concluding that he had not presented evidence of breach of implied contract and/or unjust enrichment sufficient to survive Perdomo's motion for involuntary dismissal; (3) excluding an expert witness's report concerning the value of Neibert's renovation, excavation, and construction services; (4) failing to issue special findings of fact as part of its interlocutory order; and (5) failing to address his claim for replevin in its interlocutory order.[1] Finding that the uncontroverted evidence is sufficient to support Neibert's contractual claims, we conclude that the trial court clearly erred in granting Perdomo's motion for involuntary dismissal. Finding this issue dispositive, we need not address the remaining issues, except for the admissibility of Neibert's expert witness's report, as it relates to the record on remand. As such, we reverse and remand for proceedings consistent with this opinion.

---

[1] Perdomo concedes the replevin issue and agrees that Neibert's replevin claim is appropriate for consideration on remand.

# Facts and Procedural History[2]

In 2000, childhood friends Neibert and Perdomo began a romantic relationship. At that time, Perdomo resided in Florida and worked as a hairstylist. Neibert resided in Indiana and worked mainly in construction, while also performing side jobs at his parents' mobile home park. In 2001, Perdomo and her daughter moved to Indiana to reside with Neibert and his daughter in Neibert's home. A year later, Perdomo and Neibert spent a few weeks in Florida fixing up Perdomo's house to prepare it for sale. Neibert later described his work on the Florida house as a "gift," in recognition that neither he nor Perdomo was wealthy or "blessed with extra money." Tr. at 59.

In 2003, Neibert bought Perdomo a ring and asked her to be his "best friend and partner." *Id*. at 26, 146. Later that year, Perdomo's father passed away and left her cash, his house ("Father's House"), and a sixty-five-acre plot of farmland with some dilapidated structures on it. In recognition of his friendship with Neibert, he left Neibert $15,000. At the end of that year, Perdomo and Neibert began a renovation project on Father's House, which had been deemed uninhabitable and uninsurable and had a value of about $71,000. Perdomo paid for most of the materials, and Neibert provided the vast majority of the labor, with some help from his son and a few friends. The renovation project took over a year to complete, after which Father's House was listed for

---

[2] We held oral argument at Valparaiso University Law School on April 15, 2016. We commend counsel on their excellent advocacy and thank our hosts for their hospitality.

sale for between $150,000 and $160,000. Perdomo believed it to be worth around $180,000. A sale was never consummated, and Perdomo leased Father's House at $200 per week. She did not share the rental proceeds with Neibert or pay him for his work on Father's House.

[4] In 2006, Neibert and Perdomo decided to build a home on the farmland ("the New House"). Their plan was to live there together and make it their dream home. After researching plans on the Internet, the couple settled on a plan for the New House. Perdomo applied for a building permit and listed Neibert as the contractor. The project also required excavation work, which Neibert performed. The project took five years to complete, but the couple moved from Neibert's house into the largely unfinished New House in 2007. Neibert continued to work almost full time on the project and averaged around $7000 to $10,000 in annual income from other sources. In the ensuing years, the couple's relationship began to sour, and, at one point, Perdomo threw her ring at Neibert and told him to keep it. Neibert continued to reside with Perdomo and to work on the New House. In August 2011, with the New House ninety-percent finished, the couple ended their relationship and Neibert moved out. He did not receive payment for any construction or excavation services performed on the New House.

[5] Neibert filed an action against Perdomo, seeking damages based on implied contract or unjust enrichment for labor, equipment, and materials he provided in renovating Father's House and in constructing the New House. He also sought replevin, claiming that Perdomo was in possession of several items of his

personal property at the New House and had threatened him with violence if he entered the property. Perdomo filed a counterclaim, alleging that Neibert had been unjustly enriched by living rent-free in the New House.

[6] At the ensuing bench trial, Neibert presented evidence concerning the couple's relationship, their decade of cohabitation, and his expectation of co-ownership of the properties. He also presented evidence regarding his customary rates and work hours connected to both the renovation of Father's House and the excavation and construction on the New House project, as well as evidence that Perdomo receives rental income from Father's House. He testified that Perdomo had not paid him rent while living in his house and that he had not paid Perdomo rent while living in the New House. *Id*. at 178. Near the end of his case in chief, he stated his intent to call Perdomo as a witness but said that he would proceed out of order in the interest of efficiency and examine her during her presentation of evidence. The trial court said, "Okay it is your call," and passed the case to Perdomo, who immediately moved for an involuntary dismissal pursuant to Indiana Trial Rule 41(B). *Id*. at 600. The trial court went off record and received legal authority from both parties concerning their respective positions on Perdomo's motion. The court put the remainder of the trial on hold while it took the matter under advisement.

[7] Two months later, the trial court sua sponte issued a notice granting Neibert time to file a response to Perdomo's motion to dismiss. Thereafter, Neibert filed a "Response to Motion for Involuntary Dismissal and Request for Findings." Appellant's App. at 47. In his response, for the first time, he

submitted that he had not rested his case in chief but had reserved his examination of Perdomo until her testimony during her presentation of evidence. He also asserted that the evidence he presented was nevertheless sufficient to survive dismissal. Perdomo filed a response claiming that she never acquiesced to Neibert's request to reserve her testimony as alleged.

[8] The trial court subsequently issued a half-page interlocutory order granting Perdomo's motion for involuntary dismissal and dismissing Neibert's implied contract and unjust enrichment claims. The order did not include comprehensive findings of fact and conclusions thereon. Rather, the trial court specified that it found that Neibert "did rest on his case in chief," that he had the "opportunity to call [] Perdomo … but elected to wait for cross examination," and that Perdomo "did not agree to 'reserve' [her] testimony for cross examination … but remained silent." Appellant's App. at 60. With respect to Neibert's substantive contract claims, the trial court stated, "[T]he Court adopts and reiterates [Perdomo's] position with respect to no recovery under a contract theory and no recovery under a theory of unjust enrichment." *Id*. The order did not address Neibert's replevin claim or Perdomo's counterclaim.

[9] Neibert filed a motion for entry of final judgment, an alternative request for certification of the order for interlocutory appeal, and a request for stay pursuant to Indiana Trial Rule 54(B) and Appellate Rule 14(B). The trial court certified the order for interlocutory appeal, and we accepted jurisdiction. Additional facts will be provided as necessary.

# Discussion and Decision

## Section 1 – Neibert presented evidence sufficient to survive the involuntary dismissal of his contractual claims.

[10] Neibert contends that the trial court erred in granting Perdomo's motion for involuntary dismissal pursuant to Trial Rule 41(B), which reads in pertinent part,

> After the plaintiff or party with the burden of proof upon an issue, in an action tried by the court without a jury, has completed the presentation of his evidence thereon, the opposing party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the weight of the evidence and the law there has been shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff or party with the burden of proof, the court, when requested at the time of the motion by either party shall make findings if, and as required by Rule 52(A). Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision … operates as an adjudication upon the merits.

[11] We review the grant or denial of a Trial Rule 41(B) motion to dismiss using a clearly erroneous standard. *In re M.D.*, 906 N.E.2d 931, 932 (Ind. Ct. App. 2009), *trans. denied*. In conducting such review, we neither reweigh evidence nor judge witness credibility. *Id*. We reverse only when the evidence is not conflicting and points unerringly to a conclusion different from the one reached

by the trial court. *Id.* "[I]n Indiana there is a marked judicial deference for deciding disputes on their merits and for giving parties their day in court, especially in cases involving material issues of fact, substantial amounts of money, or weighty policy determinations." *Wright v. Miller*, 989 N.E.2d 324, 328 (Ind. 2013) (citation omitted).

[12] More specifically, Neibert maintains that he presented sufficient evidence of his contractual claims to survive the involuntary dismissal of those claims. Because the parties did not have a written contract, Neibert sought recovery under the theories of unjust enrichment and implied contract.

[13] "Also referred to as quantum meruit or quasi-contract, unjust enrichment requires a party who has been unjustly enriched at another's expense to make restitution to the aggrieved party." *Reed v. Reid*, 980 N.E.2d 277, 296 (Ind. 2012). To recover for unjust enrichment, the plaintiff must show that (1) he rendered a measurable benefit to the defendant at the defendant's express or implied request; (2) he expected payment from the defendant; and (3) allowing the defendant to retain the benefit without restitution would be unjust. *Id.* Equitable principles prohibit the unjust enrichment of a person who accepts the unrequested benefits provided by another despite having the opportunity to decline those benefits. *Bright v. Kuehl*, 650 N.E.2d 311, 316 (Ind. Ct. App. 1995).

[14] Similarly, to recover under implied contract, the plaintiff generally must establish that the defendant impliedly or expressly requested the benefits

conferred. *Id*. at 315. "Any benefit, commonly the subject of pecuniary compensation, which one, not intending it as a gift, confers upon another who accepts it, is an adequate foundation for a legally implied or created promise to render back its value." *Id*.

[15] A contract can be implied from the relationship between parties. *Id*. at 313. Here, the parties were involved in a romantic relationship during the relevant timeframe, having cohabited for approximately one decade. A person who cohabits with another person without ever marrying is entitled to relief *if* he establishes an express contract, an implied contract, or unjust enrichment. *Turner v. Freed*, 792 N.E.2d 947, 950 (Ind. Ct. App. 2003).

[16] Historically, couples who cohabited without marriage were excluded from equitable relief upon a showing of the expectation of shared ownership of property acquired during their cohabitation. The seminal cases allowing recovery for cohabiting couples involved circumstances in which the couples cohabited either before marriage or after divorce. *See Glasgo v. Glasgo*, 410 N.E.2d 1325 (Ind. Ct. App. 1980) (with court narrowly tailoring its holding to circumstances where couple cohabited after divorce and evidence supported an agreement to share ownership of possession acquired during cohabitation portion of relationship), *trans. denied*; *see also Chestnut v. Chestnut*, 499 N.E.2d 783, 787 (Ind. Ct. App. 1986) (where couple cohabited before marriage and court expressly "reserve[d] for another day the question of whether premarital cohabitation without subsequent marriage gives rise to potential relief."). Later, the *Bright* court would expressly eliminate the exclusion from relief for couples

who cohabit without ever marrying. 650 N.E.2d at 315. However, the court found that the cohabitant was not entitled to relief under the facts of that case. *Id*. Thereafter, the *Turner* court granted equitable relief based on the parties' expectation of shared ownership of property acquired during a cohabitation that did not result in marriage. 792 N.E.2d at 950. We emphasize that *Glasgo* and its progeny do not create a new legal theory of recovery. Rather, these cases simply eroded and eventually eliminated an exclusion for cohabitants seeking relief on theories of implied contract and unjust enrichment in a previously prohibited context. Therefore, while we resolve the case based on the elements of unjust enrichment and implied contract, we note that the cohabitation relationship is important to the extent that it provides evidence of the couple's relative expectations.

[17]    In *Turner*, Freed filed a petition for palimony after the end of her ten-year cohabitation with Turner. She claimed that she was entitled to part of the value of Turner's business under a theory of unjust enrichment for the domestic services that she had provided him during their cohabitation. *Id*. at 948. The trial court agreed and awarded her $18,000. Turner appealed, and another panel of this Court found that Freed had presented evidence sufficient to support the trial court's finding that Turner would be unjustly enriched if Freed were awarded no part of the value of the assets that Turner had acquired solely in his name during their cohabitation. 792 N.E.2d at 951. The *Turner* court reasoned that although Turner had provided more financially during the relationship, he also had received a substantial benefit in the form of Freed's

homemaking and housekeeping services, childcare for their child and sometimes for Turner's other child, and her help with Turner's delivery routes, all of which enabled him to develop his business. *Id.* at 950.

[18] *Turner* is procedurally distinct in that it involves the appeal of a final judgment rather than an interlocutory appeal of an involuntary dismissal order. However, it is factually similar to this case in that it also involves the alleged unjust enrichment of one cohabitant who holds assets solely in his/her name but whose ability to acquire and grow those assets has been greatly enhanced by the contributions from the other. Both Freed and Neibert conferred a substantial benefit in the form of services, equipment, and materials contributed in furtherance of the relationship. If anything, Neibert's services, in the nature of renovation, excavation, and construction, were more easily quantifiable in dollars and cents than were Freed's (though Freed's were certainly no less important). Perhaps most importantly, *Turner* illustrates that to prevail, the aggrieved party need not establish an expectation of *monetary payment* for the services rendered.

[19] Here, Neibert admits that he never asked Perdomo for monetary compensation for his services in renovating Father's House and in excavating and constructing the New House. Perdomo maintains that Neibert performed these services gratuitously. She cites as support Neibert's testimony that he had previously helped her fix up her Florida home as a "gift," in recognition that neither of them was wealthy or "blessed with extra money." Tr. at 59. However, he made no similar statement of donative intent when he performed the labor on

Father's House and the New House.[3] In fact, he specifically testified that he did not intend these services to be a gift, insisting rather that he performed these services with the expectation of being a joint owner in the property based on his relationship with Perdomo. *Id*. at 58, 146. When asked whether he could have afforded to spend the hours and money for materials on Father's House and the New House without any compensation, he responded, "No." *Id*. at 60. Neibert also recounted an incident after he moved out when he went to the New House to get one of the couple's three grills: "[Perdomo] came running out of the house pushing around on me, telling me not to get worked up and she says it would be worth at least two hundred thousand dollars to get rid of my .… A-S-S." *Id*. at 530.

[20] Ron Speigle, a friend with whom Neibert bartered services, testified about a conversation in which Perdomo had told him, "I told [Neibert] he gets half the farm." *Id*. at 231. He also testified that both Neibert and Perdomo used the term "our property" when referencing the New House. *Id*. at 234. Michael Atkinson testified concerning conversations in his presence in which Perdomo and Neibert indicated their intent to live together in the New House and that "they were building it large enough to when they got older to have the bottom [floor] suitable for wheelchair access." *Id*. at 257-58. Due to Perdomo's motion

---

[3] "A gift will be valid only if the donor had the *present intent* to make a gift—if, that is, the donor intended to make a gift at the time of delivery." *Lucas v. Frazee*, 471 N.E.2d 1163, 1169 (Ind. Ct. App. 1984) (Young, J. dissenting) (citing *Lewis v. Burke,* 248 Ind. 297, 304, 226 N.E.2d 332, 336 (1967)).

for involuntary dismissal, Perdomo did not testify at trial and thus did not controvert any of this testimony on the record.

[21] As for the value of his services, Neibert presented evidence concerning his normal hourly rate and his estimated number of hours spent on the two projects. He also presented evidence showing that Father's House went from previously uninhabitable and uninsurable and worth about $71,000 to worth at least $155,000 after he renovated it. An insurance policy application listed the value of the previously nonexistent New House at $261,000. Moreover, Neibert's expert Roger Bruce testified extensively concerning the value of Neibert's labor. He described the unique features of the New House, including the roof slopes, forty-five-degree corners, tile work, and framing, and provided detailed figures concerning the value of the structure and labor, beginning with the foundation and working upwards. *Id*. at 304-23, 355. He estimated that he could sell the New House project for $269,601.51. *Id*. at 348. This included adjustments for aspects of the job that had not been completed when Neibert moved out and ceased work on the project. Bruce's extensive testimony concerning the number of hours to complete the New House spanned over a hundred pages of transcript and provided in-depth analysis of the photographic exhibits. We acknowledge Perdomo's claim that Neibert's friends provided some of the labor on the projects, but we also note the friends' testimony that they had a practice of helping each other without remuneration in exchange for services on their respective projects.

[22]     In sum, the uncontroverted evidence shows with respect to Neibert's unjust enrichment claim that he (1) rendered a measurable benefit to Perdomo in the form of construction and excavation services, materials, and equipment at Perdomo's implied request as evidenced on the building permit application, in her selection of plans, and in her continued participation in purchasing materials and cleaning up the job site; (2) he expected a proprietary interest in the property in exchange; and (3) allowing Perdomo to retain (a) the rental income and/or increase in value due to the renovation of Father's House and (b) the sole ownership of the New House, without restitution would be unjust. Similarly, with respect to his implied contract claim, the evidence shows that Neibert (1) conferred a benefit; (2) in the form of services commonly the subject of pecuniary compensation; (3) not intending the services as a gift; (4) and which services were accepted by Perdomo, thus laying "an adequate foundation for a legally implied or created promise to render back its value." *Bright*, 650 N.E.2d at 315.

[23]     Based on the foregoing, we conclude that Neibert presented uncontroverted evidence sufficient to survive involuntary dismissal of his contractual claims, and as such, the trial court clearly erred in granting Perdomo's Rule 41(B) motion. Consequently, we reverse and remand for completion of the trial on the merits.

# Section 2 – The trial court abused its discretion in excluding Neibert's expert witness's report on the value of Neibert's services.

[24]  Because of its implications on remand, we address Neibert's challenge to the trial court's exclusion of Plaintiff's Exhibit 15, Roger Bruce's written report concerning the value of Neibert's renovation, excavation, and construction services. We use an abuse of discretion standard when reviewing a trial court's ruling on the admissibility of expert testimony. *Estate of Borgwald v. Old Nat'l Bank*, 12 N.E.3d 252, 256 (Ind. Ct. App. 2014). Indiana Evidence Rule 702(a) states, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." The trial court is to control the admission of proffered expert testimony rather than admitting what is offered and leaving it to the trier of fact to determine weight to be accorded to the testimony. *WESCO Distrib., Inc. v. ArcelorMittal Ind. Harbor LLC*, 23 N.E.3d 682, 696 (Ind. Ct. App. 2014), *trans. dismissed* (2015). Once the expert's opinion is deemed admissible under Rule 702, "then the accuracy, consistency, and credibility of the expert's opinions may properly be left to vigorous cross-examination, presentation of contrary evidence, argument of counsel, and resolution by the trier of fact." *Estate of Borgwald*, 12 N.E.3d at 257 (quoting *Sears Roebuck & Co. v. Manuilov*, 742 N.E.2d 453, 461 (Ind. 2001)).

[25] Here, the trial court was the trier of both law and fact. After extended questioning and argument on the record, the trial court qualified Bruce as an expert concerning the value of renovation, excavation, and construction services, and Bruce was examined at length. However, when it came to ruling on Exhibit 15, Bruce's written estimate of the value of Neibert's services, the trial court was clearly concerned that Bruce had not personally inspected the quality of Neibert's workmanship or even visited the New House and thus lacked personal knowledge. Neibert maintains that because the trial court deemed Bruce an expert, it should have admitted Exhibit 15 and accorded it weight commensurate with its method of preparation. We agree.

[26] As for the trial court's concern that Bruce had not personally inspected the New House, such is the nature of an expert witness. *See Bunch v. Tiwari*, 711 N.E.2d 844, 848 (Ind. Ct. App. 1999) ("an expert may utilize hearsay information in forming his opinion."); *see also* Ind. Evidence Rule 703 ("An expert may base an opinion on facts or data in the case *that the expert has been made aware of or* personally observed. Experts may testify to opinions based on inadmissible evidence, provided that it is a type reasonably relied upon by experts in the field.") (emphasis added). Bruce testified at length concerning his extensive experience estimating projects. *See* Tr. at 185-92 (testifying that out of the two to three houses he built per year and the ten to twenty remodels he had done per year, about half of the projects had required him to submit a written estimate). He described his process for compiling an estimate, stating that he used a formal checklist and that, in the case of his estimate for Neibert, he

actually had "more information because it was already built and … we didn't have to guess." *Id.* at 189, 92. He later detailed his experience at valuing projects within the county and explained the sources of the figures contained in Exhibit 15, which included not only information obtained directly from Neibert but also blueprints, photos of the exterior, and aerial site photos. *Id.* at 277-89. When asked whether he needed to see the actual work in person in order to determine a project's value, he replied, "No." *Id.* at 280.

[27] The trial court also expressed concern that Bruce had not prepared the final written document himself but instead had delegated the data entry to Carl Siler, a former employee with a software program that would compile the information and calculate the figures listed in the estimate. Perdomo objected to Exhibit 15 based in part on her inability to examine Siler concerning the reliability of the software program that he used to generate the estimate. In response, Neibert cited Bruce's testimony that he had personally supplied all the data used in generating the estimate and that Siler's role was merely to input Bruce's figures into the program, which merely did "the math." *Id.* at 345. Bruce also explained that he had reviewed the estimate and made corrections after Siler generated the initial report. He likened the arrangement to a real estate appraiser providing all the information to an employee or agent, who actually prepares the appraisal.

[28] In short, as trier of both law and fact, the trial court accepted Bruce as an expert, heard his extensive testimony concerning his written estimate, and

should have admitted the estimate and weighed it accordingly. The trial court abused its discretion in excluding Exhibit 15.

[29]    Reversed and remanded.

Vaidik, C.J., and Barnes, J., concur.