

I N   T H E

# Court of Appeals of Indiana

Drew Sanders, Pure Holdings, Inc., and
Pure Development Capital, Inc.,

*Appellants-Defendants*



FILED

May 08 2026, 10:35 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court

v.

Chris Seger,

*Appellee-Plaintiff*



May 8, 2026

Court of Appeals Case No.
25A-PL-1345

Appeal from the Madison Circuit Court

The Honorable Mark K. Dudley, Judge

Trial Court Cause No.
48C06-2411-PL-156

**Opinion by Judge Weissmann**
Judges Bradford and DeBoer concur.

**Weissmann, Judge.**

[1] Chris Seger and Drew Sanders co-founded a multimillion-dollar commercial real estate development enterprise, which consisted primarily of three related business entities. Seger and Sanders ran the enterprise as equal 50-50 partners for more than a decade. When Seger decided that arrangement no longer reflected their proportionate contributions, he confronted Sanders with demands to restructure. He wanted to give two key employees ownership with voting rights and move away from the 50-50 partnership. Sanders refused. After months of unsuccessful negotiations, Seger filed for judicial dissolution.

[2] Following a seven-day bench trial, the trial court dissolved the three entities comprising the enterprise, one of which was not named as a party. The court also dismissed Sanders's counterclaims for breach of fiduciary duty and abuse of process.

[3] Sanders raises numerous issues on appeal. He challenges the dissolution of each of the three dissolved entities and claims the dismissal of his counterclaims was erroneous. He also claims Seger lost standing to defend the dissolution when Seger sold all his interest in the enterprise after the dissolution. We reverse the dissolution of the entity not made a party to the dissolution action but affirm on all other issues.

## Facts

[4] In 2012, Seger and Sanders co-founded Pure Development, Inc. (Development), a real estate development company. The company grew into a

multimillion-dollar enterprise that, over the following decade, employed 23 people and completed more than 20 projects nationwide for clients like Amazon and Domino's Pizza.

In 2019, Seger and Sanders restructured the enterprise. They formed Pure Holdings, Inc. (Holdings) as a holding company and transferred to it all their ownership interests in Development. Holdings thereby became the sole stockholder of Development, which in turn operated as Holdings' wholly-owned subsidiary. Holdings had no operations other than holding stock.[1] Seger and Sanders were 50-50 shareholders of Holdings and served as its only directors. Around the same time, Seger and Sanders formed Pure Development Capital, Inc. (Capital) to hold capital and issue guarantees on development projects. Seger and Sanders were also 50-50 shareholders of Capital and served as its only directors. Capital had no other operations of its own.

For several years, the Pure enterprise continued to operate across these three entities: Development, Capital, and Holdings.[2] In practice, there was a "complete overlap between the management of [Holdings] and

---

[1] In addition to holding 100% of Development's stock, Holdings owned 100% of the stock of two other entities: Vita Holdings, LLC, "which own[ed] a 50% interest in a specific [Development] project," and Pure Capital Partners, LLC, "which act[ed] as a manager for certain projects" without ownership interest in any entity. Appellants' App. Vol. II, p. 64.

[2] Development utilized another line of corporate entity, a special purpose entity (SPE), for each development project. The SPEs usually were held by Seger, Sanders, and other investors. After collecting payment from a client, the SPE paid Development "development fees." Tr. Vol. II, p. 122.

[Development]," as they shared personnel and facilities, filed a combined tax return, and utilized joint financial statements. Appellants' App. Vol. II, p. 64.

[7] Aside from Seger and Sanders, the key leadership team of the Pure enterprise included three individuals. Brian Palmer joined in 2016 and served as Development's chief operating officer. Adam Seger (Adam), Chris Seger's younger brother, joined in 2020 and worked in leasing. Tyler Morris joined in 2018 and worked in business development.

[8] In 2021, Seger hired business coach Kim Janson, who conducted personalized assessments of Development's key leadership personnel. In September 2022, Seger and Sanders worked with Janson to create a five-year strategic plan aimed at transitioning day-to-day responsibilities to key employees like Palmer and Adam, while Seger and Sanders stepped back from active management. However, their alignment on this plan did not hold.

[9] The following month, Seger emailed Janson expressing frustration at his "lack of synergy" with Sanders and their duplicative roles. Exhs. Vol. I, p. 155. Seger continued to privately express to others—including the business coach and senior leadership—his dissatisfaction with Sanders's level of contribution and his feeling that he had to "clean up [Sanders's] lack of interpersonal skills" with external partners and staff. *Id.* at 156. Seger also expressed a desire to grow the company on his own terms. On September 29, 2023, Seger engaged outside corporate counsel, Jim Zoccola, to advise him on "how messy things could get if [he] were to try to unwind or renegotiate" his relationship with Sanders.

Exhs. Vol. XXV, p. 196. Sanders was not copied on the email or otherwise included in this conversation.

[10] Around this same time, Morris left Development. This was a major disruption, as Morris was a "prolific business developer." Tr. Vol. II, p. 159. Before he left, Morris told Seger that he wanted an ownership interest in Development and that he had a job offer elsewhere he was considering. Seger told Morris he should accept that other offer.

[11] At the end of December 2023, Development's remaining key leadership team—Seger, Sanders, Palmer, and Adam—came together for a regular strategy meeting. At some point, Sanders left the meeting but Seger, Palmer, and Adam stayed behind. Palmer and Adam expressed frustration with Sanders's low level of involvement and their desire for ownership in the enterprise. Supportive of their requests, Seger promised to speak with Sanders.

[12] Knowing a tough conversation with Sanders was ahead, Seger reached out to Janson for advice. He told Janson that "the relationship is not equitable" and that Sanders "is not worth the value of [Palmer] and Adam other than having started the business with [him]." Exhs. Vol. II, p. 10. However, Seger stated that he wanted to "[f]ind a path for [Sanders] . . . that can add value." *Id.* He asked: "How do I manage [Sanders] being defensive and fighting to hold on while dealing with [Palmer] and Adam, who want and deserve more[?]" *Id.*

[13] Seger and Sanders met on January 10, 2024. Seger explained that he believed Sanders was not contributing equally and had created friction with employees

and business partners. Seger stated: "I do not want to end the partnership, but significant change needs to happen." Tr. Vol. II, p. 197. This "came as a shock to Sanders, who thought the two had been aligned on their five-year plan" to step back from operations. Appellants' App. Vol. II, p. 73.

[14] Over the next three months, Seger and Sanders met multiple times to discuss the restructuring of the Pure enterprise. Meanwhile, Seger and Sanders consulted with others about their options. In early February 2024, Seger set up a meeting with Attorney Zoccola about drafting language for a revised shareholder agreement for Development. Zoccola responded with proposed revisions that would allow Seger to "control the vote via simple majority (with Adam and [Palmer])." Exhs. Vol. XX, p. 75. Sanders was not included in these emails. Around this same time, Sanders personally hired his own attorney, Tara Newell, to assist in revising the shareholder agreement.

[15] On February 22, Seger sent an email to Sanders setting out his thoughts ahead of their next scheduled meeting. Seger outlined his requested changes:

1. Define and empower the Leadership Team roles.

2. Add Adam and [Palmer] to Pure ownership and modify the Operating Agreement[.]

3. Create an employee profit bonus program.

4. Adjust our ownership percentages to align with contributions.

Exhs. Vol. II, p. 16. After expanding on each point, Seger concluded with three "Options on How to Proceed": (1) implement the changes; (2) shut the business down and each go their own way; or (3) buy Sanders out completely. *Id.* at 18.

[16] Sanders responded in writing, agreeing that Adam and Palmer should be given more of a stake in the company, that an employee incentive plan should be created, and that the shareholder agreement should be revisited. On the question of ownership and voting power, Sanders wrote the following:

> However, the control of the company or voting power will not be modified in a way in which you and I no longer equally share that control. Further, there will not be the ability for you or me plus one (or two) minority owners to outvote the other cofounder [sic]. That is not how we set the business up and that is not how we envisioned it working. . . .
>
> I agree that some changes would be beneficial and, as I said above, it seems that we have common ground on many of the points you have raised. But the control piece is the biggest point, and it seems that without resolution on that one, the others are more or less irrelevant.

*Id.* at 20.

[17] The impasse as to ownership and voting rights was discussed at the next in-person meeting between Sanders and Seger. Sanders again suggested bringing Palmer and Adam into ownership *without* voting power, as he was worried about being "voted off the island." Appellants' App. Vol. II, p. 81. But Seger did not want to preserve their equal voting power, viewing his own contribution as greater than Sanders's.

[18] Then, in late March 2024, Seger received a memorandum from the company's accounting firm, Katz, Sapper & Miller (KSM), outlining a potential method to bring Palmer and Adam into the ownership structure alongside Sanders and Seger through the creation of a new corporation. Seger did not share the KSM memorandum with Sanders. He passed it on to Adam and Palmer and proposed he either buy out Sanders or shut down the business.

[19] On April 8, 2024, Seger and Sanders had their fifth and final meeting. Sanders provided Seger with a statement from Attorney Newell about broadly bringing Adam and Palmer into ownership but still without voting power. That same day, Seger presented Sanders with a buyout offer, which Sanders declined.

[20] When Seger later followed up with Sanders to schedule further discussion, Sanders responded: "I'm not interested in dilution, retirement, or dissolution. If you want to talk about how we repair our long-standing relationship and how we provide [Palmer] and Adam more growth/comp, then I'm all in." Exhs. Vol. III, p. 59. Seger replied: "I'm open to keep talking, but it sounds like the judicial dissolution path is inevitable." *Id.* He suggested they meet with Attorney Zoccola to learn about dissolution and mediation but added that Zoccola "cannot offer advice to us as individuals." *Id.* at 234. Sanders replied: "I'm not interested in dissolution, and I don't understand why or what we would mediate. Why do you think the company should be dissolved?" *Id.* at 233. Seger responded: "You and I have discussed the why for months." *Id.* Sanders declined the scheduled meeting with Zoccola.

Seger soon advised Sanders that he intended to seek judicial dissolution, prompting an attempt to mediate the underlying issues. When mediation failed, Seger filed his dissolution petition.

## *Dissolution Proceedings*

On June 5, 2024, Seger petitioned for the involuntary dissolution of Holdings and Capital. He did not name Development—the operating company and wholly-owned subsidiary of Holdings—as a party to the dissolution. The petition alleged deadlock between directors, recounting various points of contention between Seger and Sanders.

Sanders opposed the dissolution and brought counterclaims for breach of fiduciary duty, abuse of process, and fraud. Seger moved for partial summary judgment on Sanders's fraud counterclaim. The trial court granted the motion, finding Sanders failed to designate evidence that Seger gained an unconscionable advantage over Sanders, a material element of fraud.

A seven-day bench trial was conducted in February 2025. At trial, Seger highlighted 22 points of conflict between himself and Sanders as directors, including the following key disputes:

- Seger wanted to give Palmer and Adam ownership interest with voting rights, but Sanders was not willing to change the 50-50 voting model.

- Seger alleged that various external partners had a negative relationship with Sanders and did not want to work with him. Sanders offered competing testimony of partners reporting a positive relationship.

- Seger claimed Development employees reported negative interactions with Sanders. Sanders responded that this issue had never been raised with him until the present litigation.

- Seger wanted to dissolve the corporations and for each to go their own way, but Sanders did not.

[25] Seger and Sanders offered competing testimony as to the events leading up to the dissolution petition. Seger testified that "there was not a conspiracy to try to freeze [Sanders] out," noting that "it's hard to freeze somebody out that's not active." Tr. Vol. II, p. 163. Seger explained that he worked to find a role for Sanders during the restructuring discussions, though it was "disappointing" that Sanders could not figure out how to contribute meaningfully on his own. *Id.* Sanders, for his part, testified that Seger's proposals came as a surprise to him. He felt that key leadership had "purposely tried to exclude" him to "take . . . [his] value in the company for themselves." Tr. Vol. VIII, p. 34.

[26] The parties also discussed their proposed remedies. Seger presented a plan for a new company, Canopy 5, LLC, to take over Development's business, assets, and employees and to complete its projects. Seger explained that many of Development's current project partners and employees would be willing to transition to Canopy 5 and that this plan could prevent important contracts from defaulting. On the other hand, Sanders requested the court order his interest be bought out by Seger for $65 million—half of the $130 million value of Holdings and Capital as calculated by Sanders's expert.

On May 12, 2025, the trial court issued two orders. In the first, the court involuntarily dismissed Sanders's remaining counterclaims under Indiana Trial Rule 41(B), concluding that Seger's conduct did not constitute a breach of fiduciary duty or abuse of process. The court specifically found that Seger did not scheme to freeze out Sanders but had attempted to come to a compromise to no avail.

In the second order, the trial court dissolved all three Pure entities: Holdings, Capital, and Development. The court found the primary point of deadlock was in "the operation of . . . Development" and the "ownership, contribution, and governance" of the Pure enterprise. Appellants' App. Vol. II, pp. 92-93. As a result of this deadlock, "the businesses can no longer be conducted to their advantage." *Id.* at 93. The court also found that Seger and Sanders's "relationship as co-owners has suffered major deterioration, negatively affecting the operation of . . . Development." *Id.* at 94.

As to the other deadlocks alleged by Seger, the trial court gave them "trivial weight." *Id.* "Due to the conflicting evidence of Sanders'[s] reputation among employees and external partners," the court gave "the most weight to Seger's and Sanders'[s] inability to work together and agree on the operations of [Development]." *Id.*

In terms of remedy, the trial court directed the appointment of a receiver to wind up the companies, thereby rejecting both Seger's and Sanders's proposed plans. The court found that Sanders's plan for a buyout was impractical given

the difficulty of valuing an enterprise with ongoing projects. The court also found that Seger's plan to transfer business to Canopy 5 was "inequitable" because it essentially recreated Development without Sanders. *Id.* at 104.

## *Post-Dissolution Proceedings*

[31] Days after the dissolution, Sanders sought an emergency stay in the trial court, citing concerns about Seger siphoning business to Canopy 5 despite the court's rejection of this remedy plan. The court summarily denied Sanders's request for a stay and entered final judgment on its orders. Sanders then appealed both the dissolution order and the order denying his counterclaims.

[32] Over the following weeks, Sanders filed various motions, some with this Court and some in the trial court, expressing concern that Seger had implemented his court-rejected remedy plan by publicly identifying Development employees as Canopy 5 employees and marketing Development's projects and office as Canopy 5's own. On June 23, 2025, this Court entered a stay of the dissolution pending appeal. As a result, the trial court did not appoint a receiver and did not rule on Sanders's pending motions.

[33] Days later, Seger resigned as a director of all three Pure companies and transferred his ownership interests in each to an irrevocable blind trust.[3] Sanders then filed a motion in the trial court under Indiana Trial Rule 60(B)(8), seeking

---

[3] In one post-dissolution motion, Seger explained that when the instant dissolution was stayed, it created a conflict of interest between his duties to the Pure companies and his duties to his new company, Canopy 5.

relief from the dissolution order based on Seger's departure. The trial court denied the motion because this Court had stayed the dissolution order. This Court later denied Sanders's motion to remand the case to allow the trial court to rule on the 60(B) motion. This appeal proceeded to briefing.[4]

## Discussion and Decision

[34] Sanders raises various issues on appeal.[5] First, he argues that Seger's departure from the Pure companies eliminates Seger's standing on appeal. Alternatively, he claims that the trial court did not have authority to dissolve non-party Development and that the evidence was insufficient to support the dissolutions of Holdings and Capital. Finally, Sanders disputes the involuntary dismissal of his counterclaims for breach of fiduciary duty and abuse of process.

[35] Because the trial court entered findings of fact and conclusions of law, we apply a two-tiered standard of review. *See Miller v. Lucas*, 264 N.E.3d 651, 655 (Ind. Ct. App. 2025). We first determine whether the evidence supports the findings and then whether the findings support the conclusions. *Id.* (citing *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997)). Without reweighing evidence or reassessing witness credibility, we set aside the findings or judgment only if they are clearly erroneous. *Id.* As to issues not covered by the findings and

---

[4] This Court heard oral argument in this case on March 18, 2026, in the Court of Appeals courtroom in Indianapolis. We thank counsel for their skillful oral presentations. Per the Court's suggestion at oral argument, the parties mediated this matter on March 25, 2026. The mediation, however, was not successful.

[5] Sanders, Capital, and Holdings are the appellants in this case. However, the appellants' appellate brief refers to the appellants collectively as Sanders. We follow suit.

conclusions, we apply a general judgment standard and affirm on any basis in the record. *Id.*

[36] We first examine the law of judicial dissolution in Indiana and then analyze each issue in turn. In the end, we reverse the dissolution of Development but otherwise affirm.

## I. Background on Judicial Dissolution

[37] In Indiana, involuntary corporate dissolution, also known as judicial dissolution, is outlined by statute. *See* Ind. Code § 23-1-47-1 *et seq*. Seger brought the dissolution action here under Indiana Code § 23-1-47-1(2)(A), which provides:

> The circuit or superior court may dissolve a corporation . . . in a proceeding by a shareholder if it is established that . . . the directors are deadlocked in the management of the corporate affairs, the shareholders are unable to break the deadlock, and irreparable injury to the corporation is threatened or being suffered, or the business and affairs of the corporation can no longer be conducted to the advantage of the shareholders generally, because of the deadlock[.][6]

[38] When dissolution is ordered, the corporation continues to exist only to "wind up and liquidate its business and affairs." Ind. Code § 23-1-45-5; Ind. Code § 23-

---

[6] Other subsections of Indiana Code § 23-1-47-1 provide for dissolution when the shareholders are deadlocked in voting to elect new directors and for dissolution proceedings brought by the attorney general (to remedy fraud or abuse), by certain creditors, or by a corporation that has already voluntarily dissolved.

1-47-4(b) (requiring judicial dissolutions to follow winding up process provided by Ind. Code § 23-1-45-5). A third-party receiver or custodian can be appointed to manage the winding up process. A receiver may "dispose of all or any part of the assets of the corporation," and a custodian may "exercise all the powers of the corporation, through or in place of its board of directors or officers, to the extent necessary to manage the affairs of the corporation in the best interests of its shareholders and creditors." Ind. Code § 23-1-47-3(c)(1)-(2).

[39] Dissolution is a severe measure viewed by courts as a last resort. *See generally Enter. Printing & Publ'g Co. v. Craig*, 144 N.E. 542, 544 (Ind. 1924) (declining to dissolve corporation when other remedies were available). Courts proceed "with extreme caution in the forfeiture of corporate franchises." *State ex rel. Snyder v. Portland Nat. Gas Co.*, 53 N.E. 1089, 1090 (Ind. 1899) (dissolving corporation for abuse of authority in dissolution action brought by State). Because judicial dissolutions are relatively infrequent in Indiana, the caselaw construing Indiana Code § 23-1-47-1 is sparse.

## II.   Standing and Mootness

[40] Sanders first contends that Seger's post-dissolution divestiture of his interest in the Pure companies deprives him of standing on appeal and renders the deadlock issue moot. He requests this Court reverse and remand for the trial court to dismiss the entire dissolution. We are unpersuaded.

[41] It is Sanders as the appellant, not Seger as the appellee, who invoked the jurisdiction of this Court. *See Bd. of Comm'rs of Union Cnty. v. McGuinness*, 80

N.E.3d 164, 168 (Ind. 2017) (recognizing that the general rule of standing limits "the proper person to invoke the court's power" to those who have a "personal stake in the outcome" and have or will suffer from the complained-of conduct). Sanders undisputedly has a stake in the outcome of this proceeding and alleges various injuries resulting from the dissolution.

[42] Further, Seger is not "seeking" dissolution under the dissolution statutes on appeal, as Sanders claims. Seger already obtained it at a time when he undisputedly had standing as a shareholder and is now merely defending it on appeal. For this reason, the cases Sanders cites in support of his claim are inapposite. Each involves a dissolution petition or derivative action that was either still pending in the trial court or had been denied.[7] Thus, the petitioner in those cases still needed to seek affirmative relief, unlike Seger, who has already obtained it.

[43] Alternatively, Sanders claims Seger's divestiture renders the dissolution moot. But this Court is fully capable of providing the relief Sanders requests— reversing the dissolution. *See E.F. v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 188 N.E.3d 464, 466 (Ind. 2022) (noting that case is moot when controversy has ended such that court can grant no effective relief). Moreover, the question of

---

[7] *See N. Air Servs., Inc. v. Link*, 804 N.W.2d 458, 476-78 (Wisc. 2011) (shareholder lost standing to appeal *denial* of dissolution); *U.S. Fidelity & Guar. Co. v. Griffin*, 541 N.E.2d 553, 556 (Ind. Ct. App. 1989) (shareholders lost standing to *pursue* derivative action); *Cook v. Reg'l Commc'ns, Inc.*, 539 S.E.2d 171, 173 (Ga. Ct. App. 2000) (shareholder lost standing to *initiate* dissolution); *Baye v. Airlite Plastics Co.*, 618 N.W.2d 145, 152 (Neb. 2000) (same); *Martin Enters., Inc. v. Janover*, 140 A.D.2d 587, 587 (N.Y. App. Div. 1988) (same).

whether the companies should be dissolved remains a matter of real controversy between the parties. Because we are unpersuaded by Sanders's arguments as to standing and mootness, we address the merits of the appeal.

## III. Dissolution of Development

Sanders claims the trial court lacked jurisdiction to dissolve Development because it was never named as a party to this proceeding. We agree.

"A basic tenet of our judicial system is that a person or legal entity falls within the trial court's jurisdiction for a particular civil action only when he or it has been properly made a party to that action." *Bowmar Instrument Corp. v. Maag*, 442 N.E.2d 729, 730 (Ind. Ct. App. 1982) (finding court lacked jurisdiction to enter orders against entity not a party to action). A judgment rendered without personal jurisdiction over a party "violates due process and is void." *Grabowski v. Waters*, 901 N.E.2d 560, 563 (Ind. Ct. App. 2009). Seger's dissolution petition did not name Development as a party or request that it be dissolved. When Seger's pre-trial brief first suggested that Development be dissolved, Sanders responded that the court was without the authority to do so. The trial court dissolved Development anyway, without explanation or discussion at trial.

Seger claims the trial court nevertheless had jurisdiction over Development because it is an "asset" of Holdings due to Development's status as a wholly-owned subsidiary. He argues that Development could be dissolved as part of Holdings' winding up because a dissolved company's assets and property can

be "collect[ed]," "dispose[d] of," and "distribute[d]" during that process. *See* Ind. Code § 23-1-45-5(a). This theory is flawed for multiple reasons.

[47]    First, Seger cites no authority for his foundational proposition that a wholly-owned subsidiary is an asset of its parent company. Though Holdings owns 100% of Development's stock, disposing of or distributing that stock is categorically different from dissolving Development itself. *See SFN S'holders Grantor Tr. v. Ind. Dep't of State Revenue*, 603 N.E.2d 194, 198 (Ind. T.C. 1992) (citing 1 *Fletcher Cycl. L. Corp.* § 31 (rev. perm. ed. 1990)) (recognizing that "a holding company . . . does not own the assets of the corporations in which it holds shares; it owns only the shares"). Seger does not bridge this gap. His argument also appears to collapse Development's corporate form into Holdings'. But Development remains a separate corporate entity. *See McQuade v. Draw Tite, Inc.*, 659 N.E.2d 1016, 1020 (Ind. 1995) ("[A] subsidiary and its parent corporation-shareholder [are] separate legal entities.").[8]

[48]    Additionally, Seger's theory circumvents the statutory dissolution process. Indiana Code § 23-1-47-1 enumerates the sole means by which a trial court may dissolve a corporation: in a proceeding by the attorney general, a shareholder, a creditor, or the corporation itself. "A corporation is the creature of statute, and

[8] Though the trial court found that Development and Holdings were operationally intertwined, Seger does not develop this argument as a basis for Development's dissolution. We will not do so on his behalf. *See Miller v. Patel*, 212 N.E.3d 639, 657 (Ind. 2023) ("We will not step into the shoes of the advocate and fashion argument on his behalf."). Nor will we presume that the level of intertwinement that exists here is present in all parent-subsidiary relationships.

except in the exercise of statutory authority a court of equity has no power to decree its dissolution." *Enter. Printing & Publ'g Co.*, 144 N.E. at 544. "When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode." *Howard Reg'l Health Sys. v. Gordon*, 952 N.E.2d 182, 187 (Ind. 2011) (citation omitted).

[49] Nor does the plain language of the winding-up statutes otherwise support Seger's theory. Seger fails to explain how the authorization to "collect[]," "dispos[e] of," and "distribut[e]" a corporation's assets can be stretched to include the dissolution of an entirely separate legal entity. Ind. Code § 23-1-45-5. Doing so would render the dissolution statute's explicit requirements meaningless.[9]

[50] Finally, the cases that Seger cites do not compel a different conclusion. *Nozik v. Mentor Lagoons, Inc.* is an Ohio decision that addressed only the authority of a receiver to manage a subsidiary, not the court's authority to dissolve that subsidiary outright. No. 93-L-057, 1994 WL 188904, at *4 (Ohio Ct. App. May 6, 1994). His citation to *Memory Gardens Mgmt. Corp. v. Liberty Equity Partners, LLC*, 43 N.E.3d 609 (Ind. Ct. App. 2015), is also unavailing. It involved a receivership implemented under Indiana's separate receivership statute—not a dissolution—and the propriety of a receivership over a subsidiary was not at

---

[9] Seger also leaves the scope of this theory unaddressed. Holdings had two other wholly-owned subsidiaries which were not dissolved. Under Seger's theory, it appears that these subsidiaries would also be dissolved as part of Holdings' winding up, even though they were not a part of this proceeding or discussed at all.

issue. *Id.* at 612. And even in the context of receiverships, this Court has found that such relief cannot be imposed over entities not named as parties. *Towne & Terrace Corp. v. City of Indpls.*, 122 N.E.3d 846, 856 (Ind. Ct. App. 2019) (finding trial court "did not have jurisdiction" to "appoint a receiver over properties owned by nonparties").

[51] Because Development was not a party to this proceeding, the trial court lacked jurisdiction to dissolve it. We therefore reverse Development's dissolution.

## IV.   Dissolution of Holdings

[52] Sanders next challenges the sufficiency of the evidence supporting the dissolution of Holdings. In making this argument, he disputes three of the trial court's findings and conclusions. "In order to determine that a finding or conclusion is clearly erroneous, an appellate court's review of the evidence must leave it with the firm conviction that a mistake has been made." *Yanoff*, 688 N.E.2d at 1262. When conducting this review, we do not reweigh the evidence and consider "only the evidence most favorable" to the judgment. *Miller*, 264 N.E.3d at 655. Here, we find no clear error in the challenged findings and conclusions.

## A.   Conclusion that Holdings' Business Could Not Be Conducted to Shareholder Advantage

[53] Sanders challenges the trial court's conclusion that Holdings' business could not be conducted to the advantage of its shareholders—an element required by the judicial dissolution statute. *See* Ind. Code § 23-1-47-1(2)(A). Sanders argues

that, as a holding company, Holdings' only business was owning stock and that the findings fail to support the conclusion that this business was threatened. But Sanders construes the findings—and Holdings' operations—too narrowly.

[54] The trial court found that Seger and Sanders's "relationship as co-owners has suffered major deterioration." Appellants' App. Vol. II, p. 94. It found that the two had experienced "a breakdown of trust so severe that all actions of Seger are viewed by Sanders as an attempt to push him out of the company . . . while all actions of Sanders are viewed by Seger as a refusal to act for the benefit of the company[.]" *Id.* It found that disagreement between "two 50-50 owners" as to their contributions, their compensation, and the governance of "current and future operations" is especially detrimental "where, as here, there is no operating agreement or shareholder agreement that provides an avenue to break the deadlock." *Id.* at 94-95.

[55] Thus, the inability of Seger and Sanders, who are Holdings' only decision-makers, to work together and agree on critical matters demonstrates an inability to work to the advantage of the shareholders, who are Seger and Sanders themselves. Even a company whose only business is to own stock requires basic governance and functioning leadership.

[56] Despite this, Sanders argues that the enterprise's profitability shows there is no threat to the business. However, the dissolution statute does not turn on profitability. It looks to the "advantage of the shareholders," which includes a broader scope of concerns. Ind. Code § 23-1-47-1(2)(A) (requiring an

unbreakable deadlock and that "irreparable injury to the corporation is threatened or being suffered, or the business and affairs of the corporation can no longer be conducted to the advantage of the shareholders generally, because of the deadlock"). Present profitability is not a reliable measure of whether business can continue to be conducted to the shareholders' advantage; dysfunctional leadership can threaten an enterprise's future operations even though it may not affect financial statements today.

## B.    Finding that the Dispute Existed for Years

Sanders also takes issue with the trial court's finding that the "fundamental dispute" about ownership, control, and contribution had "existed for years." Appellants' App. Vol. II, p. 59. He argues that Seger did not discuss his concerns with Sanders until January 2024, when that news "came as a shock" to him. *Id.* at 73.

Even if we determined that finding was unsupported by the evidence, Sanders points to no effect that it would have on the trial court's conclusions or the ultimate dissolution. For instance, he identifies no authority establishing that a deadlock of a shorter duration is legally insufficient under Indiana Code § 23-1-47-1(2)(A). That statute instead focuses on whether the shareholders "are unable to break the deadlock." Ind. Code § 23-1-47-1(2)(A). To the extent that Sanders argues a shorter period of deadlock suggests the disagreement was not intractable, that falls within the purview of his next challenge.

## C. Conclusion that the Deadlock Could Not Have Been Resolved

[59] Finally, Sanders challenges the trial court's conclusion that the deadlock could not have been resolved. He notes that he had agreed to many of Seger's proposals—everything except equal voting power. He alleges that Seger never genuinely intended to resolve their discussions about ownership structure but essentially "manufactur[ed]" the deadlock "in order to force dissolution." Appellants' Br., p. 47. However, the evidence favorable to the judgment and the trial court's unchallenged findings support the court's conclusion that the deadlock was intractable.

[60] The court found that Seger and Sanders were diametrically opposed on various critical matters: Sanders's level of contribution and compensation, the reassignment of ownership percentages, and whether Palmer and Adam should receive voting rights. On all of these points, the court found the parties had made "little, if any, progress." Appellants' App. Vol. II, p. 93. Over the course of five meetings, Sanders remained steady in his refusal to cede 50-50 control, even after hiring his own attorney. Seger was equally unbudging, insisting that his suggested changes be implemented or the two part ways. And though Sanders did agree to other changes, he acknowledged in a contemporaneous email to Seger that "without resolution on that one [issue of control], the others are more or less irrelevant." *Id.* at 75.

[61] These findings, coupled with the severe breakdown in trust between Seger and Sanders, demonstrate the depth of their disagreement and support the trial court's conclusion that resolution was not within reach.

[62] Sanders's reliance on the KSM memorandum does not compel a conclusion to the contrary. The memorandum, on its face, does not address the central dispute over whether to depart from 50-50 control. It proposed to let the existing corporate structure run its course before creating a new entity to include Palmer and Adam. The trial court was entitled to credit Seger's testimony that he did not share the memorandum with Sanders because it proposed something Sanders had already essentially "refused to do." Tr. Vol. II, p. 212. As for Sanders's contention that Seger manufactured the deadlock, the trial court expressly rejected it, finding "nothing sinister or underhanded" in two partners moving in different directions. Appellants' App. Vol. II, p. 60. Sanders's argument is essentially an improper request to reweigh the evidence.

[63] Given the foregoing, we find no clear error in the dissolution of Holdings.

## V.   Dissolution of Capital

[64] Sanders also challenges the dissolution of Capital, which, like Holdings, is owned and governed 50-50 by Seger and Sanders. Capital was formed to hold capital and issue guarantees on projects. The trial court found it otherwise conducted "no business" of its own. *Id.* at 65.

[65] Sanders argues that the dissolution order describes only Capital's basic structure and lacks specific findings of deadlock in its management or the deadlock's

effect on its shareholders. As to matters not addressed by the trial court's findings, we apply a general judgment standard. *Miller*, 264 N.E.3d at 655. Under that standard, we affirm on any theory supported by the evidence. *Id.* Here, the evidence supports Capital's dissolution.

[66] As with Holdings, Seger and Sanders were the only two decision-makers at Capital, serving as the sole directors and shareholders of the corporation. The evidence presented at trial demonstrates that their dysfunctional relationship permeated the governance of the Pure enterprise, reaching broad issues of ownership, contribution, and compensation. Sanders identifies no evidence suggesting that his and Seger's working relationship as Capital's co-directors was somehow insulated from the broader breakdown in their relationship. Nor does he identify any mechanism unique to Capital that would have permitted its deadlock to be broken. As with Holdings, the trial court found that Capital lacks a shareholder or operating agreement.

[67] Given this evidence of irreconcilable deadlock, we affirm Capital's dissolution.

## VI. Dismissal of Sanders's Counterclaims

[68] Finally, we turn to Sanders's two counterclaims, brought against Seger personally, for: (1) breach of fiduciary duty; and (2) abuse of process. At the close of Sanders's case-in-chief, the trial court granted Seger's motion for involuntary dismissal of both claims under Trial Rule 41(B). That rule permits a court to dismiss a claim if, "upon the weight of the evidence and the law[,] there has been shown no right to relief." Ind. Trial Rule 41(B). We review such

rulings for clear error, without reweighing evidence or judging witness credibility. *Neibert v. Perdomo*, 54 N.E.3d 1046, 1050-51 (Ind. Ct. App. 2016). "We reverse only when the evidence is not conflicting and points unerringly to a conclusion different from the one reached by the trial court." *Id.* at 1051. Because Sanders fails to clear this high bar for reversal, we affirm the court's involuntary dismissal of both counterclaims.

## A.    Breach of Fiduciary Duty

[69]    A claim for breach of fiduciary duty requires proof of: (1) the existence of a fiduciary relationship; (2) a breach of the duty owed; and (3) harm to the beneficiary. *Butler v. Symmergy Clinic, PC*, 158 N.E.3d 407, 414 (Ind. Ct. App. 2020). Shareholders in a closely-held corporation stand in a fiduciary relationship to one another and must deal "fairly, honestly, and openly with the corporation and with their fellow shareholders." *Barth v. Barth*, 659 N.E.2d 559, 561 (Ind. 1995). The fiduciary "must not be distracted from the performance of his official duties by personal interests." *G & N Aircraft, Inc. v. Boehm*, 743 N.E.2d 227, 240 (Ind. 2001) (citation omitted). "It is also the policy of the law to leave corporate affairs to the control of corporate agencies 'except in a plain case of fraud, breach of trust, or such maladministration as works a manifest wrong to [the shareholders].'" *Id.* at 240-41 (quoting *W & W Equip. Co., Inc. v. Mink,* 568 N.E.2d 564, 575 (Ind. Ct. App. 1991)).

[70]    Here, the trial court found that Seger engaged in much of the conduct Sanders alleged in support of his claim, including using company counsel to draft an

updated shareholders' agreement, independently consulting with leadership coach Janson and accounting firm KSM, and withholding distributions for both Seger and Sanders during litigation. But the court found that Seger's actions reflected "efforts to come to a compromise" and that "[t]here was no secret scheme to oust Sanders, but rather a divergence of opinion." Appellants' App. Vol. II, p. 47. The court rejected Sanders's claim on three independent bases: (1) no breach; (2) no harm; and (3) protection under the business judgment rule. Sanders challenges two of the court's underlying findings and its conclusion that no breach occurred.

### i. Challenges to Findings

Sanders first disputes the trial court's finding that Seger engaged Attorney Zoccola to "draft an updated shareholders' agreement and to provide advice to him and Sanders regarding their deadlocks." *Id.* at 40. Sanders argues that Zoccola advised only Seger and did so adversely to Sanders's interests. But the record plainly supports the court's factual finding. In February 2024, Seger consulted with Zoccola for assistance in revising the shareholder agreement to include Palmer and Adam. Then, in April 2024, Seger invited Sanders to a meeting with Zoccola to discuss the deadlock and potential mediation, but Sanders declined to attend. Zoccola provided both parties a written summary afterward.

Sanders also challenges the trial court's finding that Seger's "use of corporate funds was for business development purposes" and "each expense report was approved through the regular chain of command, which included Seger,

Sanders, and KSM." *Id.* at 48. Sanders argues that he did not endorse these expenditures, which included Seger's use of the company plane to transport his litigation counsel to Colorado for depositions. However, this finding addressed only that Seger used the standard expense-reporting process, not that Sanders specifically endorsed each expenditure. Additionally, Sanders ignores Seger's proffered explanation of the plane use: that he flew to Colorado to meet with external partners on an active Pure development project in Denver and coordinated the depositions of those partners to take place during that same trip. Accordingly, his attorneys joined him on the plane. The trial court was entitled to credit Seger's explanation that the trip included business development work.[10]

## ii. Challenge to Conclusion of No Breach

[73] Sanders next argues that Seger's conduct, as reflected in the trial court's own findings, constitutes breach of fiduciary duty as a matter of law. But the authority that Sanders relies upon is factually distinguishable.

[74] Several of the cases Sanders cites rely on a finding that the shareholder engaged in a scheme to oust or freeze out a fellow shareholder—a theory the trial court here expressly rejected. *See G & N Aircraft*, 743 N.E.2d at 241-42; *Mink*, 568

---

[10] Sanders also points to a $1,470 charge for "Magna Legal Services," which he characterizes as payment for court reporter fees in this litigation. Tr. Vol. III, pp. 218; Exhs. Vol. XXVI, p. 246. But when asked about this expense at trial, Seger testified that he did not know what the entry referred to or what services Magna provided. Sanders points to no other evidence establishing the expense's nature or connection to this case. The only basis for Sanders's characterization is his counsel's leading question at trial, which is not evidence.

N.E.2d at 574. Other cases involve a shareholder luring away business that belonged in fairness to the corporation. *See McLinden v. Coco*, 765 N.E.2d 606, 615-16 (Ind. Ct. App. 2002); *Hartung v. Architects Hartung/Odle/ Burke, Inc.*, 301 N.E.2d 240, 245 (Ind. Ct. App. 1973); *Epperly v. E. & P. Brake Bonding, Inc.*, 348 N.E.2d 75, 81 (Ind. Ct. App. 1976). The court here made no such finding. Rather, it determined that Seger's remedy plan of creating Canopy 5 was an "attempt to uphold his fiduciary duties" by ensuring Development (including Sanders) would profit from ongoing projects. Appellants' App. Vol. II, p. 50.

[75] The remaining cited cases are based on a finding that a shareholder engaged in self-dealing for personal gain. *See Purcell v. S. Hills Invs., LLC*, 847 N.E.2d 991, 997-98 (Ind. Ct. App. 2006); *Lowry v. Lowry*, 590 N.E.2d 612, 622 (Ind. Ct. App. 1992). But the court here found "nothing sinister or underhanded" in Seger's conduct, which Seger "believe[d was] best for the company." Appellants' App. Vol. II, pp. 51, 60.

[76] Though Sanders claims to accept the trial court's findings, his argument on appeal essentially asks us to disregard the court's assessment of the competing evidence and accept his own theory of Seger's motive.[11] The trial court heard

---

[11] In his appellate brief, Sanders mischaracterizes many of the trial court's findings to add a layer of ill-intent to Seger's actions. For instance, he writes that the "trial court correctly found" that Seger "initiated a dissolution action for the 'inequitable' *purpose* of attempting to transfer [Development's] business, assets, and employees to Canopy 5." Appellants' Br., p. 52 (emphasis added) (citing Appellants' App. Vol. II, p. 104). The court made no such finding. The quoted portion of the court's order discussed the remedies proposed by the parties, not Seger's intent in seeking dissolution. Appellants' App. Vol. II, p. 104 ("[T]he Court rejects Seger's Proposed Remedy Plan as inequitable.").

the extensive evidence presented during the seven-day bench trial—including the competing testimony of both Seger and Sanders as to their views on the dissolution and motives—and determined that Seger acted in the interest of coming to a resolution, not to oust Sanders. The court chose to credit Seger's testimony that he tried in good faith to compromise with Sanders to no avail. We will not reweigh or reassess the evidence. *See Neibert*, 54 N.E.3d at 1050-51.

[77] Because Sanders has not demonstrated that the evidence is uncontradicted and points "unerringly" to the opposite result, we cannot say that the trial court's judgment was clearly erroneous. *Id*. at 1051. As we affirm the trial court's finding of no breach, we need not address Sanders's challenges as to the alternative bases for dismissing the claim: lack of harm and the business judgment rule.

## B.    Abuse of Process

[78] A claim for abuse of process requires proof of an ulterior purpose and a willful act in the use of process "for an end other than that which it was designed to accomplish." *Reichhart v. City of New Haven*, 674 N.E.2d 27, 30 (Ind. Ct. App. 1996). "A party's intent is irrelevant where his acts are procedurally and substantively proper under the circumstances." *Id.* at 31 (citation omitted).

[79] Sanders contends that Seger filed the dissolution action not to obtain dissolution but to pressure Sanders into a buyout and to damage Sanders's reputation. The trial court, however, found that Seger filed for dissolution substantively and procedurally in accordance with Indiana Code § 23-1-47-1,

and concluded that "Seger ha[d] not acted with any ulterior motive." Appellants' App. Vol. II, p. 55.

[80] The first finding—that Seger's use of process was proper—is dispositive and is supported by the evidence. Seger filed for dissolution as a shareholder of Holdings and Capital under the dissolution statute that expressly authorizes such relief and maintained that position throughout the litigation. Accordingly, he used the legal dissolution process "to accomplish an outcome which the process was designed to accomplish." *Reichhart*, 674 N.E.2d at 31.

[81] "[T]here is no liability [for abuse of process] where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions." *Id.* (citation omitted); *see also Midwest Holdings-Indpls., LLC v. Hennessy*, 254 N.E.3d 531, 543 (Ind. Ct. App. 2025) (finding abuse of process claim failed when use of process was proper despite evidence of "personal animus"). Seger's intent is therefore irrelevant, and Sanders's claim fails. *See Reichhart*, 674 N.E.2d at 31.

## Conclusion

[82] Because Development was not named as a party in the dissolution action, the trial court did not have authority to dissolve it. Accordingly, we reverse that dissolution. However, we affirm the dissolutions of Holdings and Capital, which were supported by evidence showing unbreakable deadlock between Seger and Sanders, who were each of those corporations' sole decision-makers.

We also affirm the involuntary dismissal of Sanders's counterclaims for breach of fiduciary duty and abuse of process.

[83] Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

Bradford, J., and DeBoer, J., concur.

ATTORNEYS FOR APPELLANT
PURE HOLDINGS, INC. AND PURE DEVELOPMENT CAPITAL, INC.

B. (Too) Keller
Matthew R. Macaluso
Keller Macaluso LLC
Carmel, Indiana

ATTORNEYS FOR APPELLANT DREW SANDERS

Andrew W. Hull
Michael R. Limrick
Christopher D. Wagner
Megan M. Riley
Hoover Hull Turner LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Robert D. MacGill
Matthew T. Ciulla
Patrick J. Sanders
Elizabeth L. Merritt
MacGill PC
Indianapolis, Indiana